IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:10CR336 |
| | ) | |
| v. | ) | |
| | ) | |
| CLAUDIA GOMEZ-DE LA CRUZ, | ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the defendant's objection, Filing No. 36, to the Findings and Recommendation ("F&R") of the magistrate judge, Filing No. 35. The magistrate judge recommended denial of the defendant's motion to suppress statements and evidence, Filing No. 23. Filing No. 35, F&R at 5. The defendant was charged in a three-count indictment with knowingly using identification documents that were not lawfully issued to her for the purpose of satisfying a requirement of an employment verification system, making a false claim of United States citizenship, and making a false representation of a Social Security number that was not assigned to her with the intent to deceive (Count III).

Pursuant to 28 U.S.C. § 636(b)(1)(A), the court has conducted a de novo determination of those portions of the F&R to which the defendant objects. *United States v. Lothridge*, 324 F.3d 599, 600-01 (8th Cir. 2003). The court has reviewed the record including the transcripts of the hearings on the motion to suppress on December 8, 2010, and the exhibits. Filing No. 34, Transcript (Tr.).

I.   BACKGROUND

The court adopts the factual findings of the magistrate judge and they need not be fully repeated here.   Briefly, Omaha Immigrations and Customs Enforcement ("ICE") officers conducted an audit of immigration documents involving Omaha Steaks in Omaha Nebraska.  Tr. at 5-6.  Through an audit of I-9 forms,[1] ICE agents were aware that Federal Trade Commission ("FTC") complaints had been made in 2005 and 2006 by individuals who claimed that their Social Security numbers were being used by other people in Omaha, Nebraska.  *Id.* at 2-7, 19; Ex. 2.  One of the complaints had been filed by a person named Amelia Cartagena.  *Id.*  ICE agent Andrew Stewart testified that he believed that as part of the audit in April 2010, Social Security numbers on the I-9 forms were run through a database, although he did not know exactly what was involved in the audit. Filing No. 34, Tr. at 12-13.  As a result of the audit, fourteen individuals were identified as "being subjects of possible identity theft."  *Id.* at 7.   Those individuals, including the defendant, were taken to a separate room, the break room, by Omaha Steaks management at the request of ICE agents.  *Id.* at 7, 13.

Approximately ten to fifteen plain-clothed, but armed, ICE agents arrived at Omaha Steaks to "conduct a preliminary interview with the targets."  *Id.* at 8, 13.  The agents had handcuffs with them and had arranged for vans to transport at least 14 people.  *Id.* at 17. ICE support staff had prepared prepackaged folders for each of the individual suspects that contained a "pre-Miranda questioning" script and copies of the FTC complaints.  *Id.* at 16.

---

[1]An I-9 form is an employment eligibility verification form that all U.S. employers are required to complete and retain for each individual they hire for employment in the United States.  The employer must indicate on the form that identity documents have been examined and appear to be genuine.  See United States Citizenship and Immigration Services website at www.uscis.gov.

ICE agent Andrew Stewart testified that upon entering the break room, he took the Amelia Cartagena file, understanding that the name was that of an individual who had been working at Omaha Steaks and was also the subject of an FTC complaint. *See id.* at 8. He asked, "Who's Amelia Cartagena?" and the defendant raised her hand. *Id.* He also testified that if any of the employees had tried to leave the interview room, they would have been detained. *Id.* at 15.

Agent Stewart testified that he asked the defendant the first two questions on the pre-*Miranda* script: her name and where she was from. *Id.* at 9. She identified herself as Amelia Cartagena and stated that she was from Puerto Rico. *Id.* Agent Stewart then turned the questioning over to Agent Reynaldo Hernandez, who was from Puerto Rico. *Id.* He asked the defendant what part of a town in Puerto Rico she was from and she was not able to tell him, prompting Agent Hernandez to tell Agent Stewart that "we have to follow up," meaning "that we were going to take her down to the detention area," or the ICE Processing Unit "to determine her immigration status and for fingerprinting." *Id.* at 22-23.

He further testified she was not read her *Miranda* rights at that time and was not Mirandized until after she arrived at the Processing Unit, at which time she invoked her right to remain silent and was fingerprinted. *Id.* at 28. Before she was transported to the Processing Unit, the defendant asked the officers to obtain her identification from her car. *Id.* at 26. Agent Hernandez then obtained the defendant's Mexican consulate card from her vehicle. *Id*; Ex. 3. The consulate card identified her as Claudia Gomez-De La Cruz. *Id.*

The magistrate judge found that the ICE agents' knowledge of false use of a Social Security number, updated by the ICE I-9 audit in 2009, furnished "probable cause to

3

administratively arrest Gomez-De La Cruz when she gave Amelia Cartagena's name and was unable or unwilling to identify the barrio she was from in the Puerto Rican town she claimed" and that those circumstances "provided an objective basis to believe Gomez-De La Cruz had violated the immigration laws."  Filing No. 35, F&R at 4.  He also found that "Miranda warnings are not required for routine booking questions or gathering biographical information and fingerprints."  *Id.* at 5.  Further, he found that the ICE agents had lawful authority to interrogate any suspected alien with respect to that alien's right to be in the United States.[2]  *Id.* at 4.  He also found the defendant had voluntarily consented to the search of her vehicle.  *Id.* at 5.

The defendant objects to the magistrate judge's findings and argues that the statements she made to ICE agents while in custody should be suppressed because she was not adequately apprised of her right not to answer questions and to have an attorney present.  She further contends that the FTC reports could not serve as a basis for reasonable suspicion because they were stale.

## II.  DISCUSSION

### A.  Law

#### 1.  Fourth Amendment

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "The simple language of the Amendment applies equally to seizures of persons and to seizures of property."  *Payton v. New York*, 445 U.S. 573, 584 (1980).

---

[2]The magistrate judge relied on 8 U.S.C. § 1357(a)(1), which provides:  "Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant--(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States."  8 U.S.C. § 1357(a)(1).

The "Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that searches conducted outside the judicial process without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Horton v. California*, 496 U.S. 128, 133 n.4 (1990) (citations omitted).   It applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.   *United States v. Brignoni-Ponce,* 422 U.S. 873, 878 (1975); *Davis v. Mississippi*, 394 U.S. 721 (1969); *Terry v. Ohio*, 392 U.S. 1, 16-19 (1968) (stating "Whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person, and the Fourth Amendment requires that the seizure be 'reasonable.'").   There are three categories of police encounters:   (1) consensual communications involving no coercion or restraint, (2) *Terry* stops—minimally intrusive seizures that are significant enough to invoke the Fourth Amendment and must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause.  *United States v. Flores-Sandoval*, 474 F.3d 1142, 1144-45 (8th Cir. 2007) ("*Flores-Sandoval II*"); *see generally Terry*,  392 U.S. at 16-20 (1968).

In a consensual encounter, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."  *United States v. Vera*, 457 F.3d 831, 834 (8th Cir. 2006) (quoting *United States v. Drayton*, 536 U.S. 194, 200 (2002)); *see also INS v. Delgado*, 466 U.S. 210, 216 (1984). "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Florida*

5

*v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)); *accord United States v. Drayton*, 536 U.S. at 201(2002) ("If a reasonable person would feel free to terminate the encounter, then he or she has not been seized."). However, "[a]n initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Delgado*, 466 U.S. at 215 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *Flores-Sandoval II*, 474 F.3d at 1145 (stating that "a consensual encounter becomes a seizure implicating the Fourth Amendment when, considering the totality of the circumstances, the questioning is so intimidating, threatening, or coercive that a reasonable person would not have believed himself free to leave").

Interrogation that relates to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure. *Delgado*, 466 U.S. at 216. The systematic questioning of employees at a workplace is not a seizure because "[o]rdinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers" and "most workers could have had no reasonable fear that they would be detained upon leaving." *Id.* at 218-19. Under the Fourth Amendment, when officers have no basis for suspecting a particular individual, they may generally ask questions of the individual and ask to examine the individual's identification. *Id.* at 216; *United States v. Escobar*, 389 F.3d 781, 786 (8th Cir. 2004). Police may not, however, convey a message that compliance with their requests is required. *Bostick*, 501 U.S. at 435.

Immigration officers are authorized, without a warrant, "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States . . . " and "to arrest any alien in the United States, if [they have] reason to believe that the alien so arrested is in the United States in violation of any [law or regulation involving the admission, exclusion, expulsion or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(1) & (2) (emphasis added); *United States v. Quintana*, 623 F.3d 1237, 1240 (8th Cir. 2010). Immigration officers also have the power, without a warrant, to make arrests

> for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony, if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

8 U.S.C. § 1357(a)(5)(B); *see* 8 C.F.R. 287.5(c)(4). The authority granted to immigration officers is not unbounded, but is subject to the principles of the Fourth Amendment as it relates to searches and seizure. *United States v. Rodriguez-Franco*, 749 F.2d 1555, 1559 (11th Cir. 1985); *Rajah v. Mukasey*, 544 F.3d 427, 441 (2d Cir. 2008) (noting that the Fourth Amendment provides protection against random or gratuitous questioning related to an individual's immigration status).

Under the interrogation component of the statute, immigration officers "may make forcible detentions of a temporary nature for the purposes of interrogation under circumstances creating a reasonable suspicion, not arising to the level of probable cause to arrest, that the individual so detained is illegally in this country." *Au Yi Lau v. INS*, 445 F.2d 217, 223 (D.C. Cir. 1971) (applying *Terry* standards). Immigration authorities may not

7

detain persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (rejecting the argument that a person's apparent Mexican ancestry alone justifies belief that he or she is an alien and satisfies the requirement of the statute allowing interrogation and arrests of aliens). A plain reading of 8 U.S.C. § 1357 (a)(1) requires the government to show that immigration officials believe that a person is an alien before questioning him. *Flores-Sandoval I*, 422 F.3d 711, 714 (8th Cir. 2005); *see also* 8 C.F.R. § 287.8(b)(2) (an immigration official may briefly detain a person for questioning if he "has a reasonable suspicion, based on specific articulable facts, that the person being questioned is engaged in an offense against the United States or is an alien illegally in the United States").

Under the arrest component of the statute, "[b]ecause the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in 8 U.S.C. § 1357(a)(2) means constitutionally required probable cause." *Quintana, 623 F.3d at 1240*. The regulations promulgated under that statute provide that "[a] warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." 8 C.F.R. § 287.8(c)(2)(ii) (emphasis added). The regulations further provide that "[a]t the time of the arrest, the designated immigration officer shall, as soon as it is practical and safe to do so: (A) Identify himself or herself as an immigration officer who is authorized to execute an arrest; and (B) State that the person is under arrest and the reason for the arrest." 8 C.F.R. § 287.8(c)(2)(iii). They also provide, "with respect to a person arrested and charged with a criminal violation of the laws of the United States, the arresting officer shall advise the

person of the appropriate rights as required by law at the time of the arrest, or as soon thereafter as practicable."  8 C.F.R. § 287.8(c)(2)(v).

An alien present in this country who was inadmissible when he entered is deportable.  *Quintana*, 623 F.3d at 1240.  "'A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime.'"  *Id.* (quoting *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984)).  Immigration law is generally regulatory rather than criminal and deportation hearings are civil proceedings.  *Lopez-Mendoza*, 468 U.S. at 1038; *United States v. Perez-Perez*, 337 F.3d 990, 997 (8th Cir. 2003) ("Civil deportation proceedings do not trigger the criminal rules of procedure").  The exclusionary rule does not apply to civil deportation proceedings, in part because "the INS has its own comprehensive scheme for deterring Fourth Amendment violations by its officers."  *Lopez-Mendoza,* 468 U.S. at 1044-45 (noting that "[t]o safeguard the rights of those who are lawfully present at inspected workplaces the INS has developed rules restricting stop, interrogation, and arrest practices" and the "regulations require that no one be detained without reasonable suspicion of illegal alienage, and that no one be arrested unless there is an admission of illegal alienage or other strong evidence thereof.").

The regulations implementing 8 U.S.C. § 1357(a) carefully distinguish between warrantless arrests for the purpose of commencing civil deportation proceedings, and warrantless arrests for criminal violations.  *Quintana*, 623 F.3d at 1240 & n.1 (noting that the regulations require that when a person is "arrested and charged with a criminal violation of the laws of the United States, the arresting officer shall advise the person of the appropriate rights as required by law," and must take the defendant without unnecessary

9

delay before a magistrate judge or other appropriate judicial officer, whereas "[b]ecause arrests under § 1357(a)(2) for the purpose of deporting an illegal alien result in 'civil' or 'administrative' removal proceedings, aliens held in that type of custody are not entitled to the protections of Rule 5(a) of the Federal Rules of Criminal Procedure [providing for appearance before a magistrate]").  When an individual is arrested on a reasonable belief that he has committed a felony, the regulation involving the conduct of arrests by immigration officers provides that a suspect be promptly advised of "appropriate rights as required by law," a proviso that is not included in the regulations on civil administrative arrests.  *Compare* 8 C.F.R. § 287.8(c)(iii) & (iv) (regarding conduct of administrative arrests) *with* 8 C.F.R. § 287.8(c)(v) & (vi)(regarding conduct of arrests for felonies).

### 2.   Fifth Amendment

Under *Miranda v. Arizona*, 384 U.S. 436, 484 (1966), certain warnings must be given any time a suspect is in custody and is subject to interrogation by law enforcement officials. *United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir. 2009).  In order to qualify for the Fifth Amendment privilege against self-incrimination that *Miranda* warnings are designed to protect, however, "a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 189 (2004).

Police officers are not required to administer Miranda warnings to everyone whom they question; the protections of Miranda apply only to an interrogation when the suspect is in custody.  *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). "*Miranda* defines custodial interrogation as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *United States v. Hogan*, 539 F.3d 916, 922 (8th Cir.

2008) (quoting *Miranda*, 384 U.S. at 444). An individual is in custody when "a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest." *Flores-Sandoval II*, 474 F.3d at 1146.

To determine whether a defendant is "in custody" for *Miranda* purposes, the court considers the "totality of the circumstances" confronting the defendant at the time of the interview. *Id.* The court's "focus during this inquiry is on 'objective circumstances, not on subjective views of the participants.'" *United States v. Muhlenbruch*, — F.3d —, —, 2011 WL 536493 at *3 (quoting *Flores-Sandoval II*, 474 F.3d at 1146). The court considers six factors in determining whether an individual is in custody for the purposes of *Miranda*: (1) whether the suspect was informed that he or she was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong-arm tactics or strategies were employed; (5) whether the atmosphere was police-dominated; or, (6) whether the suspect was placed under arrest at the end of questioning. *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir.1990). These factors are not exclusive; custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *United States v. Czichray*, 378 F.3d 822, 827-28 (8th Cir.2004). The "most obvious and effective means of demonstrating that a suspect has not been taken into custody" is expressly advising the suspect that he is not under arrest and that his participation in questioning is voluntary. *United States v. Brave Heart*, 397 F.3d 1035, 1039 (8th Cir. 2005) (quoting *Griffin*, 922 F.2d at 1349).

Not all government inquiries to a suspect in custody, however, amount to interrogation. *United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985).

Interrogation for *Miranda* purposes refers to any questioning or conduct that the government officer should know is reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *United States v. Ochoa-Gonzalez*, 598 F.3d 1033, 1038 (8th Cir. 2010). Interrogation is not limited to "express questioning," it also includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301; *United States v. Lockett*, 393 F.3d 834, 837 (8th Cir. 2005).

Generally, asking a routine booking question is not interrogation under *Miranda*. *Id.* (noting that a request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating); *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion) (exempting questions to secure the biographical data necessary to complete booking or pretrial services from *Miranda's* coverage). Permissible questions include those that "appear reasonably related to the police's administrative concerns." *Muniz*, 496 U.S. at 602; *United States v. McLean*, 409 F.3d 492, 498 (1st Cir. 2005) (the booking exception "allows police officers to ask general background questions (name, date of birth, etc.) while processing a newly arrested individual without advising him of his *Miranda* rights."). When the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, however, the questioning is subject to scrutiny under *Miranda*. *Ochoa-Gonzalez*, 598 F.3d at 1033 (finding suppression of the defendant's name was not required because the defendant's name was never in doubt and was not directly relevant to the substantive

offense in the case); *accord United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996) (finding a defendant's name wholly incidental to his arrest for a drug crime). The "booking exception" to *Miranda* does not mean that any question asked during the booking process falls within that exception—without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions. *Muniz*, 496 U.S. at 602 n.14; *United States v. Scott*, 270 F.3d 30, 44 n.8 (1st Cir. 2001) (stating "[c]ases in which law enforcement officers have reason to know that routine booking questions may indeed produce inculpatory responses, however, form an exception to the exception"); *United States v. Parra*, 2 F.3d 1058, 1068 (10th Cir. 1993) (involving questions about a suspect's true name "for the direct and admitted purpose of linking [the suspect] to his incriminating immigration file").

Also, to be covered by the Fifth Amendment and protected by *Miranda*'s exclusionary rule, the statement must be incriminating. *Hiibel* 542 U.S. at 189 (involving the validity of a state's "stop and identify" statute, in the context of a valid *Terry*-type stop, under the Fifth Amendment). The Fifth Amendment does not prohibit the compelled disclosure of an individual's name "absent a reasonable belief that the disclosure would tend to incriminate him." *Id.* at 191. The "Fifth Amendment privilege against compulsory self-incrimination 'protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.'" *Id.* at 190 (quoting *Kastigar v. United States*, 406 U.S. 441, 445 (1972)). "Answering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances." *Id.* at 191 (noting that "[i]n every criminal case, it is known and must be known who has been arrested and who is

being tried," and "[e]ven witnesses who plan to invoke the Fifth Amendment privilege answer when their names are called to take the stand.").

The Supreme Court acknowledges, however, that "a case may arise where there is a substantial allegation that furnishing identity at the time of a stop would have given the police a link in the chain of evidence needed to convict the individual of a separate offense," and "the court can then consider whether the privilege applies, and, if the Fifth Amendment has been violated, what remedy must follow." *Id.* Although it may be "a rare case indeed in which asking an individual his name, date of birth, and Social Security number would violate *Miranda*," there are situations where asking a person's name "might reasonably be expected to elicit an incriminating response," for example in an "arrest for impersonating a law enforcement officer or for some comparable offense focused on identity." *United States v. Reyes*, 225 F.3d 71, 77 (1st Cir. 2000) (noting that "[i]n such scenarios, the requested information is so clearly and directly linked to the suspected offense that we would expect a reasonable officer to foresee that his questions might elicit an incriminating response from the individual being questioned."); *see also Ochoa-Gonzalez*, 598 F.3d at 1039 (finding that inquiry as to name was routine information where the defendant's name was never in doubt and was not directly relevant to the substantive offense); *Brown*, 101 F.3d at 1274 (finding a defendant's name was not relevant to his arrest for a drug crime). Under the regulations promulgated under 8 U.S.C. § 1357, with respect to persons arrested and charged with criminal violations, the arresting immigration officer is required to "advise the person of the appropriate rights as required by law at the time of the arrest, or as soon thereafter as practicable" and to "assure that the warnings are given in a language the subject understands." 8 C.F.R. § 287.8(c)(2)(v). The subject

must acknowledge that the warnings are understood and the officer must document the fact. *Id.* In contrast, an alien arrested and charged administratively is to be advised of the reason as for his or her arrest and the right to counsel at government expense, as well as the fact that statements may be used against him,

### 3. Fruit of the Poisonous Tree

If a seizure is unreasonable, "evidence obtained as a direct result" of that seizure, and evidence "later discovered and found to be derivative of an illegality or fruit of the poisonous tree," must be excluded. *Segura v. United States*, 468 U.S. 796, 804 (1984). Further, statements that result from an illegal detention are inadmissible. *United States v. Flores-Sandoval*, 422 F.3d 711, 714 (8th Cir. 2005) ("*Flores-Sandoval I*"). Fingerprints obtained by exploiting an unlawful detention, and under circumstances that are not sufficient to have purged the taint of the initial illegality, are also subject to application of the exclusionary rule. *United States v. Guevara-Martinez*, 262 F.3d 751, 756-57 (8th Cir. 2001) (noting that "[t]he absence of evidence that the fingerprinting resulted from routine booking, and the concomitant inference that an INS-related purpose motivated the fingerprinting" counseled in favor of applying the exclusionary rule); *see also Flores-Sandoval I*, 422 F.3d at 715 (suppressing fingerprint evidence, noting absence of consent to the taking of fingerprints and finding it "unlikely that [the defendant] felt free to decline [an immigration officer's] request for fingerprints and terminate the encounter.").[3] Evidence

---

[3]The Eighth Circuit Court of Appeals noted in that case that suppression would be of little value to the defendant since ICE could issue a detainer to retake custody of the defendant "because, as a jurisdictional rather than an evidentiary matter, his body and identity cannot be suppressed as fruit of the poisonous tree." *Flores-Sandoval I*, 422 F.3d at 715. The court commented that "ICE will likely obtain a new set of fingerprints from [the defendant] for civil deportation proceedings, and the government may recharge him with illegal re-entry after deportation" and stated that, though the result had "a somewhat academic feel to it," the court found that "reminding the government that it must do things 'the right way'" served an important interest. *Id.* (quoting *Guevara-Martinez*, 262 F.3d at 756).

15

obtained as a result of a constitutional violation may still be admissible if the later discovery is significantly attenuated from the primary violation, if the later discovery was inevitable, or if the later discovery was supported by an independent, taint-free source.  *United States v. Villa-Gonzalez*, 623 F. 3d 526, 534 n.7 (8th Cir. 2010).  "[T]he public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred."  *Nix v. Williams*, 467 U.S. 431, 443 (1984).

　　　　B.  Analysis

　　　　　　1.  Defendant's Detention and Arrest

The court agrees with the magistrate judge that the FTC complaints, having been reviewed in the audit process in 2009, were not so stale that they could not be considered as a reasonable ground for suspicion or probable cause for arrest.  A warrantless arrest is authorized under 8 U.S.C. § 1357.  That statute and the regulations promulgated thereunder contemplate a warrantless arrest only if the officer has both a reason to believe that an immigration offense or other felony crime is being committed and a reason to believe that the person is likely to escape before a warrant can be obtained.  The FTC reports furnished a reason to believe the felony crime of identity theft was being or had been committed.  Once the immigration officers were informed that an Omaha Steaks employee was working under a name that had been the subject of an FTC complaint, immigration officers had probable cause to arrest that individual.  The officers could also reasonably believe that, once alerted to the fact of a Social Security fraud investigation, an individual using a stolen Social Security number would not be likely to either remain at or return to her place of employment.  Once the defendant had been identified by her

employer as the person using the fraud victim's name and Social Security number, the ICE agents had probable cause to arrest her. As outlined below, a more appropriate course would have been to identify the defendant through her employer, give the defendant a *Miranda* warning prior to questioning her in custody, and, if she consented to make a statement, give her the opportunity to explain herself. The officers had probable cause to arrest the defendant, however, whether or not she made any statements because her employer could link her to the stolen Social Security number.

### 2.   Admissibility of Defendant's Statements

With respect to the defendant's statements, the court finds that the controlling factor herein is the distinction between the detention and administrative arrest of a suspected alien for deportation and his or her detention and arrest for a criminal offense. The increasing practice of subjecting aliens to criminal prosecution rather than deportation creates a different paradigm in these cases.

The court first finds the defendant was in custody while in the break room being questioned by ICE agents. The factors relevant to the custody determination weigh in favor of custody. No reasonable person in the defendant's position would have believed herself free to terminate the interview and leave. The immigration officers admitted the defendant would have been detained if she had attempted to leave. The defendant was not told that she free to leave or that she was not under arrest. She did not possess freedom of movement. She did not initiate the contact with officers, and she had no other choice but to acquiesce to the demands of her employer. Although there is no evidence of strong-arm tactics or deceptive strategies, the atmosphere was clearly police-dominated. Up to fifteen immigration agents were present in the interview room and all of them were

armed. Transport vehicles were present and the defendant was placed under arrest shortly after the interview concluded. The court finds that while she was in the break room, the defendant's freedom of movement was restricted to a degree that a reasonable person in her position would associate with formal arrest.

The court further finds that the questioning of the defendant amounted to interrogation that does not fall within the "routine booking" exception to *Miranda*. Under the circumstances of this case, asking the question, "who is Amelia Cartagena?" is law enforcement conduct that an ICE officer should know is reasonably likely to elicit an incriminating response. When the disclosure of a name presents no reasonable danger of incrimination, the Fifth Amendment is not implicated. The questions characterized as "pre-*Miranda*" inquiries (asking name and country of origin) may be valid in the deportation context, or as part of either a purely consensual encounter or a permissible *Terry*-stop. The circumstances presented in this case, however, involve none of those things. This is the unusual case where asking for identity information is directly relevant to the crime charged and provides a link in the chain of evidence necessary to convict the individual of the offense. The answer to a request for her name and other identifying facts is not information "likely to be so insignificant in the scheme of things," that the inquiries should be permitted. Significantly, the interrogation went beyond those two identifying questions and sought additional information.

Reliance on 8 U.S.C. § 1357 and its implementing regulations as authority for the interrogation is misplaced. That statute authorizes only brief interrogations of a suspected alien with respect to the person's right to be or remain in the United States. It does not

18

encompass custodial interrogations of suspected felons and, in fact, instructs immigration officers to promptly Mirandize those individuals arrested for felony crimes.

By their own admission, the ICE agents were not at Omaha Steaks to conduct administrative deportations; they were there to investigate identity-theft crimes. They had targeted 14 individuals and came prepared to transport 14 individuals back to immigration headquarters for booking. They sought information, in a custodial setting, that went to an element of the offense for which the defendant was targeted, investigated, and eventually charged—identity theft. Armed with the knowledge that a person by the name of Amelia Cartagena had filed a complaint involving fraudulent use of her Social Security number and the further knowledge that a person at Omaha Steaks was working under that name, a reasonable officer would know that asking for someone to identify herself as Amelia Cartagena would be likely to elicit an incriminating response. Moreover, the officers could have ascertained each individual target's "identity" by means that would not have triggered the concerns addressed in *Miranda* by having Omaha Steaks management separately identify each individual suspect. Reliance on the "booking exception" to support the custodial questioning also fails because the exception applies only to newly-arrested individuals and the defendant, although not free to leave, had not been arrested at the time she was asked the identification questions.

The record in this case shows that immigration officers, from the outset, were investigating a criminal matter and not pursuing an administrative arrest and deportation. Because the encounter at the defendant's workplace fell within the purview of a criminal investigation, the defendant was entitled to Fourth and Fifth Amendment protections she would not be given in a civil case. This was not the sort of systematic questioning, akin to

19

a consensual encounter, that the Supreme Court approved in *INS v. Delgado*.  There was nothing consensual about gathering specifically targeted individuals in a room for questioning.  The facts in this case do not involve an encounter in which a police officer approaches an individual and asks a few questions, if the citizen is willing to listen, when the officer has no reason to suspect criminal activity.  The defendant was specifically targeted and investigated for a serious crime.  The immigration officers admitted they suspected her of identity theft.  The officers were reasonably aware that the information they sought, while it may have been in the nature of identification in an ordinary case, was directly relevant to the substantive offense they were investigating.

The information that the defendant was employed under the name of Amelia Cartagena was known to her employer and had been conveyed to the ICE officers.  Once she was identified by her employer, she was subject to either an administrative arrest and removal or arrest and prosecution for the crime of identity theft.  Under the administrative scheme, ICE officers may briefly interrogate a person reasonably believed to be an alien with respect to her right to be or remain in the United States.  The statute granting immigration officers the power to arrest an individual for any felony cognizable under the laws of the United States, however, does not authorize the interrogation of a suspect in custody about criminal charge.

### 3.   Seizure of I.D.

The defendant asserts that the seizure of her Mexican Consulate I.D. card is the fruit of the poisonous tree from either her illegal arrest or illegal interrogation.  The defendant does not dispute that she requested or gave permission to the officers to retrieve the identification.   The finding that the arrest of the defendant is supported by

20

probable cause forecloses the defendant's argument that the seizure of the defendant's Mexican consulate card was the fruit of an illegal arrest.

Although questioning the defendant in custody violated the defendant's rights under the Fifth Amendment, the court finds that the evidence of her identity that was retrieved from the defendant's car at her request need not be suppressed. The evidence was not obtained through exploitation of the illegality. By the time the defendant asked the officer to retrieve the I.D., she was no longer sequestered in the interview room. There is no evidence that the officers prompted, instigated, pressured or caused the defendant to make such a request.

Furthermore, evidence that would inevitably have been discovered is not subject to exclusion. To suppress the evidence would put the law enforcement officers in a worse position. The officers could have obtained the information that the defendant was posing as Amelia Cartagena from her employer. If she had not been targeted for criminal prosecution, she was still subject to administrative arrest as an illegal alien. Absent the statements the defendant made in the custodial interrogation, the officers would have been able to determine her identity. The court is aware that this may be an academic exercise, but, like the Eighth Circuit Court of Appeals, finds that reminding the government that it must do things the right way serves an important interest. *See Flores-Sandoval I*, 422 F.3d at 715. The court finds the defendant's objection to the magistrate judge's F&R should be sustained with respect to the defendant's statements, but denied in all other respects. Accordingly,

IT IS HEREBY ORDERED:

1.   The defendant's objection to the magistrate judge's F&R (Filing No. 36) is sustained in part, in accordance with this order.

2.   The findings and recommendations of the magistrate judge (Filing No. 35) are adopted in part and rejected in part, in accordance with this order.

3.   The defendant's motion to suppress (Filing No. 23) is sustained with respect to her statements, but denied in all other respects.

DATED this 11th day of March, 2011.

BY THE COURT:


s/ Joseph F. Bataillon_____
Chief District Judge

_____

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.